# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JASON SHOWERS, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 3:13-1147 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| Acting Commissioner of | § | |
| Social Security, | § | |
| | § | |
| *Defendant.* | § | |

## REPORT AND RECOMMENDATION

Jason Showers ("Showers") seeks review of an adverse decision on his applications under the Social Security Act for disability insurance and supplemental security income benefits.[1]

## I.  Judicial Review

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence.  *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g). Further, Congress directs reviewing courts to take "due account" of "the rule of prejudicial error."  5 U.S.C. § 706; *see also* 28 U.S.C. § 2111 (directing that

---

[1]  Disability Insurance, authorized by Title II of the Social Security Act and funded by social security taxes, provides income to insured individuals forced into involuntary, premature retirement by reason of disability. Supplemental Security Income, authorized by Title XVI of the Social Security Act and funded by general tax revenues, provides an additional resource to assure that disabled individuals' incomes do not fall below the poverty line.

judgments given upon examination of records be "without regard to errors or defects which do not affect the substantial rights of the parties"); *see also* FED. R. CIV. P. 61 (stating that "the court must disregard all errors and defects that do not affect any party's substantial rights").

## II. Background

*A.  Personal*

Showers was born in 1971 with bilateral club feet which required several reconstructive surgeries including bone transplant.  (T. 329).  He continues to have club feet bilaterally, with his left foot medially rotated.  (T. 331).  He has bilateral leg atrophy above his heels.  (*Id*.).  He walks with a limp.  (T. 293).  He claims to have significant foot pain with prolonged standing or walking. (T. 329).  He takes pain medication that makes him drowsy.  (T. 48).

Around 2nd grade, Showers began to receive special education services as a learning-disabled and emotionally-disturbed child.  When he was 12, intelligence testing (WISC-R) demonstrated Showers's intelligence quotient (IQ) at 97,[2] or *slightly less than average* range of function.  (T. 234).  Further educational testing the following year, however, revealed *severe academic deficits* (*e.g.*, 5.2 grade level in mathematics, 2.2 reading recognition, and 3.0 spelling). (T. 215).  While still in ninth grade at age 17, he moved into an apartment by himself.  (T. 221).  Thereafter, he was teased at school for his body odor and smelly clothes.  (T. 221-22).  Finally, in 1989, at almost age 19 and still in 9th grade, he dropped out of school altogether, having remained in 9th grade for *six*

---

[2]     General intellectual functioning is defined by the intelligence quotient ("IQ") obtained using one or more of the standardized, individually administered intelligence tests.  *See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* 41 (4th ed., Text Revision 2000).

years.[3]  (T. 40).   Thereafter, Showers tried to obtain a GED,[4] but was unsuccessful.  (T. 255, 677).

Showers was placed in self-contained special education classrooms due to behavioral problems and absenteeism.  (T. 213, 215, 221).  In 7th grade, he was absent 23 days from school; in 8th grade he was absent 53 days; in 9th grade (1985-86) he was absent 42 of 75 days and failing all subjects.  (*Id.*).  In 1989, the school psychologist noted in an evaluation:

> [Showers] is a nearly eighteen year old, emotionally disturbed student who has displayed a chronic pattern of absenteeism, disturbed behavior, and disregard for personal self-care.  The intensity of his disordered state dictates continued supervision through a special education program.

(T. 243).

In or around December, 1983, Showers's father died of a heart attack. Shortly thereafter, Showers was admitted to the Young Adolescent Program at the Virginia Center for Psychiatry due to a serious suicide attempt by overdose (pills), where he remained for approximately four months.  (T. 536).  In April, 1984, Showers's mother secured his early release (T. 536-37), but regression was evidenced immediately with reports of excessive absenteeism, poor class participation and self-control, disrespect toward teachers, and poor peer interaction.  (T. 215).

---

[3]      The record indicates that Showers remained enrolled in school to meet eligibility requirements for Supplemental Security Income based on his father's benefits.  (T. 242).

[4]      General Educational Development ("GED") tests are a group of subject tests which, when passed, certify that the test taker has high school-level academic skills. Generally, States award a Certificate of High School Equivalency or similarly titled credential to persons who meet the passing score requirements.

Besides absenteeism, Showers displayed other forms of unacceptable behavior (*e.g.*, fighting, smoking in unauthorized areas, and grabbing a female student on the buttocks). (T. 215, 237). In 1985, he was charged as a juvenile with forcible sodomy on a 4-year old boy. (T. 242, 537). His older sister sexually abused him several years earlier. (T. 537). In 1986, at age 15, Showers was committed to a juvenile correctional facility for violating terms of probation. (T. 538). Showers's adult legal history includes in 1998, possession of marijuana; 2008, possession of a police weapon (baton); 2010, open container (dismissed); and parking tickets. (T. 333-34).

Since 1983, Showers smokes two packs of cigarettes daily. (T. 329). He also smokes cigars and, occasionally, marijuana; he also drinks wine and liquor. (T. 329-30). He has had difficulty sleeping since 13 years old. (T. 333). He drinks a lot of soda and about four pots of coffee a day. (T. 333). He reports having one child, and he lives alone. (*Id*.).

Showers's last employment was as a drill machine operator in 2008. (*Id*.). During a general layoff, he was one of the first to go for not keeping up with pace and productivity. (T. 43, 249). According to psychological testing performed during the pendency of his application at issue here, he currently exhibits below average range of intellectual ability with an IQ of only 80. (T. 680). He reads at only fourth-grade level. (T. 41-42, 333, 680).

B.   *Claim*

In June 2009, Showers applied for disability insurance benefits and supplemental security income benefits, claiming that he became unable to work

as of September 16, 2005,[5] due to a learning disability, club feet, and arthritis in his ankles. (T. 248). After early administrative denials, he requested an evidentiary hearing, and his claim was assigned to administrative law judge, John P. Ramos ("ALJ Ramos").

ALJ Ramos conducted an evidentiary hearing in February 2012. (T. 31-72). Showers, represented by legal counsel, attended and testified. (*Id*.). The remaining sources of evidence included medical records, educational records, consultant reports (both examining and nonexamining), written statements from friends, and deposition testimony from a vocational expert retained by Showers's counsel. ALJ Ramos did not elicit separate testimony from an impartial vocational expert.

ALJ Ramos denied Showers's applications in a written decision dated March 2, 2012. (T. 14-25 ). The Appeals Council denied Showers's request for review. (T. 1-6). Showers then instituted this proceeding.

## III. Commissioner's Decision[6]

ALJ Ramos found that Showers met the insured-status requirements of the disability insurance benefits program at all relevant times.[7] (T. 16). At Step

---

[5]     Showers later amended his alleged disability onset date to January 1, 2009.

[6]     ALJ Ramos utilized a five-step sequential evaluation procedure prescribed by regulation and approved by courts as a fair and just way to determine disability applications in conformity with the Social Security Act. The procedure is "sequential" in the sense that when a decision can be reached at an early step, remaining steps are not considered. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987)(citing *Heckler v. Campbell*, 461 U.S. 458, 461 (1983)). A full discussion of the Commissioner's five-step process is contained in *Christiana v. Commissioner of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

[7]     Disability Insurance benefits typically are more generous than Supplemental Security Income. Once ALJ Ramos determined that Showers was fully insured, his claim for Supplemental Security Income effectively became moot.

2 of sequential evaluation, ALJ Ramos found that Showers has severe impairments of bilateral club feet, ankle arthritis, and borderline intellectual functioning (inclusive of a reading disorder). He declined to find that other alleged mental disablements – personality disorder, depression and anxiety – were severe impairments because they were not medically-determinable abnormalities. (T. 17).

ALJ Ramos assessed Showers's residual functional capacity[8] as follows:

> . . . [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). Mentally, the claimant retains the ability top understand and follow simple written or oral instructions and directions; perform simple tasks with supervision and independently; maintain attention and concentration for simple tasks; regularly attend to a routine and maintain a schedule; relate to and interact appropriately with others in carrying out simple tasks; and handle reasonable levels of stress, defined as being able to perform simple work requiring only decision making directly related to the performance of simple tasks.

(T. 18).

ALJ Ramos found that Showers cannot perform his past relevant work as a dishwasher, food service worker, recycling worker, construction laborer, and machine operator as each of these jobs exceeds his physical residual functional capacity. (T. 23). Hence, ALJ Ramos proceeded to the final step of sequential evaluation (Step 5) to determine whether there is alternative and available work that a person with Showers's residual functional capacity can perform. There, ALJ Ramos consulted the Medical–Vocational Guidelines, commonly referred to

---

[8]    "Residual functional capacity" refers to what persons can still do in work settings despite physical and/or mental limitations caused by their impairments and related symptoms, such as pain. *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *see also* SSR 96–8p, Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, at *2 (July 2, 1996).

as "the grids."[9]  (T. 24). He concluded that a finding of "not disabled" was appropriate under the framework of Rule 201.25 and SSR 85-15.[10] (T. 24). Thus, Showers's application was denied.  (T. 24-25).

## IV.  Points of Alleged Error

Showers's brief proffers four points of error as follows:

1. Defendant erred in failing to properly assess Plaintiff's mental impairments, finding his personality disorder, depression, and anxiety not medically determinable, and not severe;

2. Defendant erred in failing to properly assess and weight the medical opinion of evidence;

3. The ALJ failed to properly asses [*sic*] credibility; and

4. Defendant incorrectly assessed Plaintiff's residual functional capacity; and erred in failing to obtain vocational testimony, since Plaintiff's impairments included significant non-exertional impairment [*sic*].

(Dkt. No. 14).

---

[9]     The Medical Vocational Guidelines ("grids") are a matrix of general findings established by rule as to whether work exists in the national economy that a person can perform. When properly applied, they ultimately yield a decision of "disabled" or "not disabled." *Zorilla v. Chater*, 915 F. Supp. 662, 667 & n. 2 (S.D.N.Y. 1996); *see also Bombard-Senecal v. Commissioner of Soc. Sec.*, No. 8:13-cv-649 (GLS), 2014 WL 3778568, at *4 (N.D.N.Y. July 31, 2014)(citing 20 C.F.R. pt. 404, subpt. P, app. 2, § 202.21 (directing a finding of "not disabled" for younger individuals capable of performing light work that have at least a high school education and can speak English).

[10]     SSR 85-15, Titles II And XVI: Capability To Do Other Work – The Medical-Vocational Rules As A Framework For Evaluating Solely Nonexertional Impairments, 1985 WL 56857 (SSA 1985).

# V.    Step 2 Severity Determination

At Step 2 of sequential evaluation, administrative law judges decide whether claimants have "severe impairments."  If not, their applications are denied.  If so, evaluations proceed to subsequent sequential steps.

"Impairments" are "anatomical, physiological, or psychological abnormalities . . . demonstrable by medically acceptable clinical and laboratory techniques."  *See* 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D); 20 C.F.R. §§ 404.1508, 416.908.  "Severe" impairments are those that significantly limit physical or mental abilities to do basic work activities.  *See* 20 C.F.R. §§ 404.1521(b), 416.921(b); *see also* SSR 85–28, TITLES II AND XVI: MEDICAL IMPAIRMENTS THAT ARE NOT SEVERE, 1985 WL 56856, at *3-4 (SSA 1985).  The phrase "significantly limits" is not synonymous with "disability."  Rather, it serves to "screen out *de minimis* claims."  *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995).  Consequently, "[a] finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' . . . [with] . . .'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting *Bowen v. Yuckert*, 482 U.S. 137, 154 n. 12 (1987)).

When mental impairments are at issue, Step 2 severity findings are accomplished in the aftermath of application of a "special technique" set out in 20 C.F.R. §§ 404.1520a(b)-(e), 416.920a(b)-(e); *see also Kohler v. Astrue*, 546 F.3d 260, 265–66 (2d Cir. 2008) (describing analysis).  This technique, summarized in the note below, helps administrative law judges determine at Step 2 of

sequential evaluation whether claimants have medically-determinable mental impairments and whether such impairments are severe.[11]

Under this technique, *functional effects* of mental impairments are factored. Step 2 functional-limitation findings, however, are not synonymous with mental residual functional capacity. Administrative law judges assessing residual functional capacity "cannot simply rely on the limitations articulated in the severity analysis . . . , but must instead provide 'a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments.'" *Ladue v. Astrue*, No. 3:12–cv–600 (GLS), 2013 WL 421508, at *3 n. 2 (N.D.N.Y. Feb. 1, 2013) (quoting SSR 96–8p, 61 Fed. Reg. 34,474, 34,477 (July 2, 1996)) (emphasis added)).

## A.  *Evidence of Mental Impairment*

Showers's mental status during formal schooling and through age nineteen was summarized earlier in Section II. From that point, there is a gap of almost twenty years. Showers was not evaluated again by medical professionals until

---

[11]     Administrative law judges first "must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document [those] findings." 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). Next, they must assess the degree of functional limitation (*Id.*, §§ 404.1520a(b)(1), 416.920a(b)(2)), *i.e.*, the degree to which claimants' impairments functionally limit their "ability to function independently, appropriately, effectively, and on a sustained basis." *Id.*, at §§ 404.1520a(c)(2), 416.920a(c)(2). To complete this assessment, they must "rate the degree of functional limitation" in four areas: (1) "[a]ctivities of daily living;" (2) "social functioning;" (3) "concentration, persistence, or pace;" and (4) "episodes of decompensation." *Id.*, at §§ 404.1520a(c)(3), 416.920a(c)(3).

For the first three areas, administrative judges provide ratings of "[n]one, mild, moderate, marked, [or] extreme." 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). For the fourth, they provide ratings on a four-point scale: "[n]one, one or two, three, four or more." *Id.* They generally conclude that mental impairments are not severe when claimants receive a rating of "none" or "mild" in each of the first three areas and "none" in the fourth area. *Id.*, at §§ 404.1520a(d)(1), 416.920a(d)(1); *Kohler*, 546 F.3d at 266.

he applied for disability-based Social Security benefits. Within that recent time frame, ALJ Ramos received evidence from two examining consultants and a non-examining consultant. Each source provided a psychiatric or psychological diagnosis and an assessment of functional limitations. Summaries of their diagnostic findings are as follows:

Sara Long, Ph.D. (State agency examining psychologist)

After performing a psychological examination, Dr. Long diagnosed Showers with Learning Disability and Attention Deficit Hyperactivity Disorder ("ADHD"). (T. 335). Dr. Long observed Showers's appearance as "neat and well-groomed," his speech as "fluent and clear," his thought processes as "coherent and goal-directed," his affect as "appropriate," and his mood as "euthymic." (T. 334). Dr. Long conducted a verbal examination of attention and concentration (serial 3s) and recent and remote memory skills (repeating and recalling objects), but did not administer psychological testing (intelligence or behavior). (T. 334-35). Dr. Long cautioned, however, that Showers's "cognitive factors" were not "fully evaluated," and she recommended intelligence quotient ("IQ") testing to "clarify" Showers's cognitive abilities as well as a "VESID or similar vocation evaluation." (T. 336).

Z. Mata, Psychiatry (State agency reviewing medical consultant)

Dr. Mata did not examine Showers, but performed a review of his file for the Commissioner. From Showers's education records, Dr. Mata noted his 9th grade education with an IQ (testing last performed at age 12) of 97. Dr. Mata also reviewed Dr. Long's report, noting that Showers repeated 3 objects immediately and 2 after 5 minutes, completed 6 digits forward and 3 backward,

as well as Dr. Long's report indicating that Showers can take care of his own grooming, cook, clean, shop, and do laundry. (T. 353).

### Mary Ann Moore, Pys.D. (Broome Co. Dep't of Soc. Servs. psychologist)

After performing a psychological evaluation (including administering of standardized tests) on November 17, 2011, Dr. Moore diagnosed Showers with depressive disorder, anxiety disorder, alcohol abuse (in partial remission), cannabis abuse (in remission), rule out schizoaffective and bipolar disorder, and personality disorder; club feet and arthritis in both ankles. (T. 681). Dr. Moore observed Showers's appearance, speech and language, and thought process as "abnormal," noting his hygiene was marginal and his hair was quite askew; speech was pressured; and, he was rambling and circumstantial and very difficult to follow his train of thought. (T. 679). Showers's mood, affect, and orientation were "normal," observing him as "euthymic," "appropriate to speech and thought content"; "he smiles and laughs appropriately;" "he is an engaging man." (*Id*.). On psychological testing (WAIS-IV), Showers received an IQ of 80, which indicates he is currently functioning in the below average range of intellectual ability. (T. 680). On testing demonstrating reading/decoding (WRAT-IV), he demonstrated results in a grade equivalent of 4.2, suggestive of a reading disorder. (*Id*.). Adaptive behavior testing (Vineland-2 Adaptive Behavior Scales) suggested moderately low deficits in overall adaptive behavior. (*Id*.).

### B.    *ALJ Ramos's Step 2 Findings*

ALJ Ramos found that Showers has *one* severe mental impairment of borderline intellectual functioning (inclusive of a reading disorder). (T. 16). With respect to *additional* mental impairments diagnosed by examining sources (Dr. Moore and Dr. Long), he stated:

[T]he record does not contain *sufficient* evidence of any other mental impairment. The claimant *has not been treated for any psychiatric disorders as an adult* and *aside from his test results*, the claimant's mental status exams has been essentially benign.

\* \* \*

Given the *lack of objective findings*, it is clear that Dr. Moore's and Dr. Long's additional diagnoses (6F, 18F) were based *solely* upon the claimant's subjective reports and are therefore not found to be severe medically determinable impairments.

(T. 17) (emphasis added). ALJ Ramos emphasized that Showers's mood was reported as "euthymic" by both examiners, and his affect was appropriate to speech and thought content; he smiled and laughed; he could perform simple calculations. (*Id.*, citing T. 334, 679).

## C.  *Showers's Challenges; Commissioner's Responses*

Showers argues that ALJ Ramos's Step 2 finding that his personality disorder, depression and anxiety are not medically-determinable impairments is erroneous for several reasons. First, he argues that Dr. Moore is an "acceptable medical source"[12] qualified to determine whether Showers suffers from mental impairments, including personality disorder, depression and anxiety. Second, he argues that Dr. Moore diagnosed these impairments in

---

[12]   The Commissioner categorizes medical opinion evidence by "sources" described as "treating," "acceptable" and "other," and prescribes hierarchical rules for weighing such evidence. See 20 C.F.R. §§ 404.1502, 404.1513(a), 416.913(a), 416.902. An acceptable medical source opinion or diagnosis is necessary to establish existence of a medically determinable impairment. *See* SSR 06-03p, Titles II and XVI: Considering Opinions and Other Evidence From Sources Who Are Not "Acceptable Medical Sources" in Disability Claims, 2006 WL 2329939, at *4 (SSA Aug. 9, 2006). Evidence from all three sources can be considered when determining severity of impairments and how they affect individuals' ability to function. *Id.*, at *4.

"Acceptable" medical sources are licensed physicians (medical or osteopathic doctors), psychologists, optometrists, podiatrists, and speech-language pathologists. 20 C.F.R. §§ 404.1513(a), 416.913(a). "Acceptable medical source . . .includes treating sources, nontreating sources, and nonexamining sources." 20 C.F.R. §§ 404.1502, 416.902.

exact accord with a protocol prescribed in the Commissioner's own regulation,[13] *i.e.*, by considering "symptoms, signs and psychological test findings."

Third, Showers argues that ALJ Ramos's extrapolation of "essentially benign" psychiatric findings from Dr. Moore's and Dr. Long's assessments that Showers has "fair" insight and judgment[14] represents a misinterpretation of that term as it is clinically understood, and precipitated an impermissible substitution of ALJ Ramos's lay opinion for that of expert medical sources.[15] Fourth, Showers argues that ALJ Ramos erred in refusing to find these abnormalities as medically-determinable impairments due to lack of adult psychological treatment without first assessing whether lack of insight, lack of medical insurance coverage and poverty (rather than lack of need) explained that circumstance.

The Commissioner defends ALJ Ramos's finding, essentially arguing that ALJ Ramos's reasoning was sound, and his finding supported by substantial evidence. The Commissioner further argues that even if ALJ Ramos should have treated Showers's personality disorder, depression, and anxiety as severe impairments, any error was harmless because ALJ Ramos proceeded beyond Step 2 of sequential analysis. (Dkt. No. 15, pp. 4-8).

---

[13]    Showers cites 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00 (introduction to evaluation of disability on basis of mental disorders) and 20 C.F.R. § 404.1528 (defining signs, symptoms and laboratory findings). (Dkt. No. 14, p. 9).

[14]    Dr. Long's assessment was "poor to fair." (T. 335).

[15]    On this point, Showers further argues that ALJ Ramos improperly "cherry-picked" some of Dr. Long's findings, notably those that minimized psychological limitations, while ignoring others in order to bolster ALJ Ramos's lay interpretation of raw psychological data. (Dkt. No. 14, p. 11).

*D.    Application*

ALJ Ramos's decision does not reflect that he applied the "special technique" described earlier to determine whether Showers's claimed personality disorder, depression and anxiety rise to the level of impairments, *i.e.*, medically-determinable abnormalities. ALJ Ramos never mentions symptoms, signs or laboratory findings – the evaluative factors prescribed by the applicable regulation. Courts conducting judicial review in social security cases, however, do not require perfect opinions or rigid, mechanical, formulaic applications of administratively-prescribed evaluative protocols. *See Cichocki v. Astrue*, 729 F.3d 172, 177–78 (2d Cir. 2013) (declining to adopt a *per se* rule that failure to conduct a prescribed function-by-function analysis of residual functional capacity is grounds for remand). Thus, this omission, alone, does not constitute reversible error, especially when, as here, ALJ Ramos discussed at least some of Dr. Moore's and Dr. Long's examination findings (which he interpreted as "essentially benign"), and concluded that no "objective findings" support their diagnoses of additional mental impairments.

ALJ Ramos erred, however, when concluding that the evidentiary record lacked "sufficient evidence" to support a finding that Showers has these additional mental impairments. First, both Dr. Long and Dr. Moore, as examining consultative psychologists, are "acceptable medical sources" who are competent to diagnose and evaluate functional effects of mental impairments. Second, Dr. Moore's diagnoses of personality disorder, depression, and anxiety were based on the symptoms-signs-laboratory findings protocol prescribed by the governing regulation and in the introduction to evaluation of mental disorders

(Listing 12.00).[16] She described Showers's "symptoms" (*e.g.*, depressed for years, irritable, nightmares, feeling unsafe, difficulty sleeping, distracted, frustrated, slow on job, drift off and lose concentration, etc.). (T. 677). She reported "signs" from her examination, including marginal hygiene (unkempt hair); pressured speech; rambling and circumstantial thought process; impaired memory for remote information; impaired recent memory; log cognitive functioning; insight and judgment only fair. (T. 679). She factored in "laboratory findings" consisting of psychological tests results (*e.g.,* WAIS-IV, the WRAT-IV, and the Vineland-2 Adaptive Behavior Scales). (T. 680). Finally, she relied on Showers's longitudinal psychological history, including special education classes; behavior issues at school; possible history of abuse by his sister; his suicide attempt; and his psychiatric hospitalization for several months. (T. 215, 242, 677-78).

Dr. Moore's diagnoses of personality disorder, depression and anxiety were based on sufficient medical evidence consisting of symptoms, signs, and laboratory findings (psychological test findings). No acceptable or other medical source refuted or disagreed with these diagnoses, and ALJ Ramos's rejection of

---

[16]    Listing 12.00 provides:

                                . . .

B.    Need for medical evidence. ***We must establish the existence of a medically determinable impairment(s) of the required duration by medical evidence consisting of symptoms, signs, and laboratory findings (including psychological test findings)***. . . . Symptoms and signs generally cluster together to constitute recognizable mental disorders described in the listings. . . .

C.    Assessment of severity. We measure severity according to the functional limitations imposed by your medically determinable mental impairment(s). We assess functional limitations using the four criteria in paragraph B of the listings: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. . . . . *See* §§ 404.1520a and 416.920a.

20 CFR Pt. 404, Subpt. P, App'x 1, § 12.00 (emphasis added).

them was error. In effect, ALJ Ramos improperly substituted his own lay judgment for competent medical opinion. *See Balsamo v. Chater*, 142 F.3d 75, 80–81 (2d Cir. 1998).

Dr. Long did opine that Showers has the capacity to perform basic mental work activities, but cautioned that Showers's cognitive abilities required further evaluation. Although this opinion related more to *severity* of Showers's mental impairments than their *existence*, ALJ Ramos apparently gave "great weight" to it when deciding that Showers did not present sufficient evidence to establish that he suffers from additional mental impairments of personality disorder, depression and anxiety. Even then, ALJ Ramos disregarded Dr. Long's opinion that more testing was needed regarding Showers's capacity to perform basic mental work activities. ALJ Ramos thus "cherry picked" the evidence, relying on statements arguably supporting his conclusion, while ignoring other substantive detail to the contrary from the same source.[17] Reliance on Dr. Long's guarded assessment of Showers's capacity to perform basic mental work activities while rejecting Dr. Moore's better-informed opinions does not satisfy the substantial evidence standard.

---

[17] While administrative law judges are entitled to resolve conflicts in the record, they cannot pick and choose only evidence that supports a particular conclusion. *See Smith v. Bowen*, 687 F. Supp. 902, 904 (S.D.N.Y. 1988) (citing *Fiorello v. Heckler*, 725 F.2d 174, 175-76 (2d Cir. 1983)); *see also Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) ( "The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability.").

In short, ALJ Ramos rejected Dr. Moore's and Dr. Long's diagnoses of additional mental impairments for no good reason.[18] His ensuing failure to determine whether these impairments were severe at Step 2 of sequential evaluation, and to consider limitations associated therewith through the remainder of sequential evaluation was error.

## VI.  Harmless Error Analysis

Earlier-mentioned congressional mandates (requiring courts reviewing administrative decrees to take due account of "the rule of prejudicial error" and disregard all administrative errors and defects not affecting "substantial rights") refer to what modern jurisprudence calls "harmless error doctrine." *See Shinseki v. Sanders*, 556 U.S. 396, 406-08 (2009).  Under this doctrine, a reviewing court

---

[18]     ALJ Ramos discounted Dr. Long's and Dr. Moore's diagnoses of additional mental impairments because they "were based solely upon the claimant's subjective reports." (T. 17).  Apart from that statement's factual inaccuracy, it is legally flawed as well.  There is nothing amiss about an acceptable medical source relying on subjective symptoms to form a *diagnosis*:

> It is axiomatic that a treating psychiatrist must consider a patient's subjective complaints in order to diagnose a mental disorder.  In fact, whether dealing with mental health or not, consideration of a "patient's report of complaints, or history, [a]s an essential diagnostic tool," is a medically acceptable clinical and laboratory diagnostic technique.  *Hernandez v. Astrue*, 814 F. Supp.2d 168, 182 (E.D.N.Y. 2011) (citing *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003).  This is especially true for diagnoses of mental disorders because unlike orthopedists, for example, who can formulate medical opinions based upon objective findings derived from objective clinical tests, scans or x-rays, a psychiatrist typically treats the patient's subjective symptoms or complaints about those symptoms.

*Santana v. Astrue*, No. 12 Civ. 0815(BMC), 2013 WL 1232461, at *14 (E.D.N.Y. Mar. 26, 2013).

ALJ Ramos further discounted Dr. Long's and Dr. Moore's diagnoses because each recorded that Showers's mood was euthymic, and he could complete serial threes and similar mental exercises.  This evidence has more relevance to *severity* of an impairment than to its *existence*.  Even late-stage Alzheimer disease patients often exhibit euthymic moods, and recite poetry, sing songs and prattle on for hours recalling facts stored in long-term memories.

must reverse and remand when an administrative law judge errs when reaching a decision, unless, as a matter of law, the result could not be affected by the error. *See NLRB v. Enterprise Assoc.*, 429 U.S. 507, 522 n. 9 (1977). In other words, administrative legal error is harmless when a reviewing court confidently concludes that the same result would have been reached had the error not occurred. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("[W]here application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration.").

A variant of this doctrine applies with respect to Step 2 errors. *All* impairments, *i.e.*, both severe and nonsevere, must be factored into a residual functional capacity determination that precedes sequential Step 4.[19] Several courts conclude that an error in failing to identify *all* severe impairments at Step 2 is harmless when an administrative law judge identifies *some* severe impairments at Step 2, and proceeds through subsequent sequential evaluation on the basis of *combined effects* of *all*, including those erroneously found to be nonsevere. *See Stanton v. Astrue*, 370 Fed. App'x 231, 233 n.1 (2d Cir. 2010) (summary order).[20] Thus, when functional effects of impairments erroneously

---

[19] In making a finding regarding residual functional capacity, administrative law judges must consider all of the claimant's impairments, including impairments that are not severe. *See* 20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e), 416.945; SSR 96-8p, TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 1996 WL 374184, at *5 (SSA July 2, 1996).

[20] *See also Warren v. Astrue*, No. 10-CV-500S, 2012 WL 32971, at *4 (W.D.N.Y. Jan. 6, 2012) (despite ALJ's "lack of clarity" at step two, ALJ properly considered all the effects of all Plaintiff's impairments, making remand inappropriate); *Briggs v. Astrue*, No. 09-CV-1422 (FJS/VEB), 2011 WL 2669476, at *4 (N.D.N.Y. Mar.4, 2011) (when ALJ concluded that Plaintiff had an impairment considered severe under the Act ... and continued with the sequential analysis, any arguable error in his findings ... at step two of the analysis was harmless); *McCartney v. Commissioner of Soc. Sec.*, Civil Action No. 07-1572, 2009 WL 1323578, at *16 (W.D. Pa. May 8, 2009) ("Even if ... ALJ did err in excluding headaches from the list of severe impairments, any such error was harmless because the ALJ found other severe impairments at step two and proceeded through the sequential evaluation on the basis of Plaintiff's severe and non-severe impairments.").

determined to be nonsevere at Step 2 are fully considered and factored into subsequent residual functional capacity assessments, the Step 2 error effectively is cured, and a reviewing court can confidently conclude that the same result would have been reached absent the Step 2 error.

This Step 2 variant is inapplicable here. Since ALJ Ramos found that Showers's claimed personality disorder, depression and anxiety were not medically-determinable abnormalities rising to the level of impairments, functional limitations attributable thereto were never considered at subsequent evaluative steps or when formulating Showers's residual functional capacity.

All limitations contained in the residual functional capacity finding related to Showers's foot, ankle, and borderline intelligence impairments. A reviewing court cannot conclude that a Step 2 error with respect to severity of distinct mental impairments (personality disorder, depression and anxiety) automatically becomes harmless simply because sequential analysis proceeds through Step 5 solely on the basis of another mental impairment (borderline intellectual functioning) whose functional limitations may be dissimilar. Accordingly, traditional harmless error analysis applies here.

Absent his Step 2 error in failing to find personality disorder, depression and anxiety as impairments, ALJ Ramos would have assessed their severity. Whether he found them severe or not, he would have considered their combined effects when determining Showers's residual functional capacity. In so doing, he likely would have added limitations commonly associated with personality disorders, depression, and anxiety.[21] Since these would all be nonexertional

---

[21]     ALJ Ramos may have found Showers's maladaptive behaviors, including absenteeism, not to be a matter of choice, but the involuntary result of his additional mental impairments. If so, functional deficits attributable to these impairments would then be factored into Showers's residual functional capacity. They could include Showers's incapacity for "regularly attending to a routine and maintaining a schedule" more than 50% of the time (T. 681) and cognitive deficits interfering with Showers's ability to function "on a regular basis." (T. 335, 351-52).

limitations, he could have determined that testimony from a vocational expert would be necessary to determine the extent of erosion of Showers's occupational base for unskilled sedentary work, and whether remaining jobs that Showers can still perform exist in significant numbers in the national economy.

A reviewing court cannot presume the substance of such testimony. This precludes a harmless error finding.

## VII. Remaining Points

Showers's remaining points of error relate to ALJ Ramos's residual functional capacity finding, weighting of medical source opinions, credibility assessment of subjective testimony, and use of the Medical–Vocational Guidelines instead of obtaining vocational expert testimony.

It is pointless to address these arguments until severity of Showers's additional mental impairments is assessed and associated limitations are factored into a valid residual functional capacity finding. The outcome of this case in its present posture will not change whether or not these additional points are meritorious or baseless. Addressing them administratively on remand, however, may avoid a second action for judicial review.

## VIII. Recommendation

The Commissioner's decision denying disability benefits should be REVERSED and the case REMANDED pursuant to 42 U.S.C. § 405(g), sentence four, for further proceedings.

## IX. Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011) (summary order); *FDIC v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the ___17___ day of ___February___ 2015.

_____
Earl S. Hines
United States Magistrate Judge